## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION | ) | |
| 800 K Street, N.W., Suite 1000 | ) | |
| Washington, D.C.  20001 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-380 |
| | ) | |
| RUSSELL VOUGHT, in his official capacity as | ) | |
| Acting Director of the | ) | COMPLAINT FOR |
| Consumer Financial Protection Bureau, | ) | DECLARATORY AND |
| 1700 G Street, N.W. | ) | INJUNCTIVE RELIEF |
| Washington, D.C.  20552 | ) | |
| | ) | |
| Defendant. | | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

Plaintiff National Treasury Employees Union (NTEU) is a labor union that represents federal government employees in 37 agencies and departments in grievances and litigation. NTEU also negotiates collective bargaining agreements with agency employers, pushes for legislation that improves the working lives of federal employees, and engages in general advocacy for federal employees' rights. NTEU's mission is to ensure that federal employees are treated with dignity and respect.

NTEU brings this action on behalf of its members, current and former employees of the Consumer Financial Protection Bureau, seeking to stop the Bureau's ongoing disclosure of employees' personal information to Elon Musk and the other members of the "Department of Government Efficiency." The Bureau's

action divests NTEU members of their privacy rights, in violation of federal law and regulation.

### JURISDICTION

1.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

### VENUE

2.      Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e). NTEU is located in Washington, D.C. Defendant also resides in Washington D.C., and a substantial part of the events or omissions giving rise to the claim occurred in Washington, D.C. because the Consumer Financial Protection Bureau is headquartered here.

### PARTIES

3.      Plaintiff NTEU is an unincorporated association with its principal place of business at 800 K Street, N.W., Suite 1000, Washington, D.C. 20001. NTEU is, pursuant to Title VII of the Civil Service Reform Act, Public Law No. 95-454, 92 Stat. 1111, the exclusive bargaining representative of tens of thousands of federal employees in 37 departments and agencies, to include more than a thousand current and former employees at the Consumer Financial Protection Bureau. NTEU represents the interests of these employees by enforcing employees' collective and individual rights through grievances and federal court litigation; negotiating

collective bargaining agreements; filing unfair labor practice charges; and advocating in Congress for favorable working conditions, pay, and benefits.

4.    NTEU brings this action on behalf of its members who are current or former employees at the Consumer Financial Protection Bureau.

5.    Defendant Russell Vought is head of the Office of Management and Budget and, as of February 7, 2025, the Acting Director of the Consumer Financial Protection Bureau.

## STATEMENT OF CLAIMS

6.    Created in the aftermath of the 2007-08 financial crisis, Defendant Consumer Financial Protection Bureau (CFPB) is an independent agency of the U.S. Government whose mission is to support and protect American consumers in the financial marketplace. It accomplishes that mission by monitoring financial markets for risks to consumers; enforcing consumer finance law; investigating consumer complaints; and writing rules to protect consumers from unfair, deceptive, or abusive practices in the financial sector. Pub. L. 111–203 (2010). *See* https://www.consumerfinance.gov/about-us/the-bureau/ (last visited Feb. 9, 2025).

7.    CFPB has supervisory authority over depository institutions with $10 billion or more in assets such as banks, thrifts, and credits unions. The Bureau has supervisory authority over non-depository entities such as mortgage originators and servicers, payday lenders, and private student lenders. In addition, the Bureau supervises consumer reporting, consumer debt collection and foreclosure, student loan servicing, international money transfer, and automobile financing. *See*

https://www.consumerfinance.gov/compliance/supervision-examinations/institutions/ (last visited Feb. 9, 2025).

8.     As of December 2024, CFPB has obtained more than $21 billion in monetary compensation, principal reductions, cancelled debts, and other consumer relief as part of its enforcement and supervisory work. Through its enforcement activities, CFPB has collected approximately $363 million associated with harm to American servicemembers and veterans. And more than $5 billion has been collected by CFPB from companies and individuals that violated the law, which the Bureau deposits into a victim relief fund. *See* https://www.consumerfinance.gov/about-us/the-bureau/ (last visited Feb. 9, 2025).

9.     As of December 2024, CFPB has received approximately 6.8 million complaints from consumers, including more than 4.6 million complaints about credit reporting; 83,000 complaints about medical debt collection; and 96,000 complaints about student loans. *See id.*

## CFPB's Privacy Act Obligations Pertaining to Disclosure

10.     While carrying out its statutory responsibilities on behalf of consumers, CFPB is subject to the requirements of the Privacy Act, 5 U.S.C. § 552a, with respect to any system of records that it maintains on individuals. This obligation also applies to records and information that CFPB maintains about its current and former employees.

11.    The Privacy Act requires that an agency like CFPB publish a notice in the Federal Register whenever it establishes or revises a system of records. 5 U.S.C. § 552a(e)(4).

12.    At least 30 days before issuing a System of Records Notice, the agency must "publish in the Federal Register notice of any new use or intended use of the information in the system [ ] and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

13.    The agency is prohibited from disclosing records covered by the Privacy Act to any other person or agency unless "the individual to whom the record pertains" consents or a statutory exception to disclosure applies. *Id.* § 552a(b).

14.    The Privacy Act permits the disclosure of information in twelve specified exceptions. For example, an agency is authorized under the Privacy Act to disclose records and information about individuals to the Census Bureau, to law enforcement, to Congress, or pursuant to a court order. *See, e.g., id.*

15.    An additional exception, at *id.* § 552a(b)(1), allows for disclosure of records "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties".

16.    Another exception permits an agency to disclose information for "routine use". *Id.* § 552a(b)(3). "[T]he term 'routine use' means, with respect to the disclosure of a record, the use of such record for a purpose for which it was collected". *Id.* § 552a(a)(7).

17.     Prior to disclosure for "routine use", the Privacy Act requires the agency to identify "each routine use of the records contained in the system, including the categories of users and the purpose of such use". *Id.* § 552a(e)(4).

18.     The current System of Records Notice for CFPB was published in the Federal Register on September 9, 2024. 89 Fed. Reg. 73077 (Sept. 9, 2024). That Notice identifies categories of individuals whose records and information are housed in CFPB's system of records, to include "individuals who are current or former [ ] employees" as well as "CFPB staff assigned to monitor supervised institutions." 89 Fed. Reg. at 73079.

19.     CFPB regularly collects and uses information about these employees. The September 2024 System of Records Notice lists the categories of records collected and used by the Bureau, for example, "information about CFPB employees assigned to supervision tasks, including, without limitation, name, address, phone number, and email address, and other employment information". *Id.*

20.     In that same September 2024 System of Records Notice, CFPB updated its list of routine uses, including categories of users and the purposes of such uses. Consistent with that Notice, "all or a portion of the records or information" contained in CBPB's system of records "may be disclosed outside of CFPB as a routine use" *only* in the following circumstances:

(1) To appropriate agencies, entities, and persons when (a) the CFPB suspects or has confirmed that there has been a breach of the system of records; (b) the CFPB has determined that as a result of the suspected or confirmed breach

there is a risk of harm to individuals, the CFPB (including its information systems, programs, and operations), the Federal Government, or national security; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the CFPB's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm.

(2) Another Federal agency or Federal entity, when the CFPB determines that information from this system of records is reasonably necessary to assist the recipient agency or entity in (a) responding to a suspected or confirmed breach or (b) preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal Government, or national security, resulting from a suspected or confirmed breach.

(3) Another Federal or State agency to: (a) permit a decision as to access, amendment, or correction of records to be made in consultation with or by that agency, or (b) verify the identity of an individual or the accuracy of information submitted by an individual who has requested access to or amendment or correction of records.

(4) The Office of the President in response to an inquiry from that office made at the request of the subject of a record or a third party on that person's behalf.

(5) Congressional offices in response to an inquiry made at the request of the individual to whom the record pertains.

(6) Contractors, agents, or other authorized individuals performing work on a contract, service, cooperative agreement, job, or other activity on behalf of the CFPB or Federal Government and who have a need to access the information in the performance of their duties or activities.

(7) The DOJ for its use in providing legal advice to the CFPB or in representing the CFPB in a proceeding before a court, adjudicative body, or other administrative body, where the use of such information by the DOJ is deemed by the CFPB to be relevant and necessary to the advice or proceeding, and in the case of a proceeding, such proceeding names as a party in interest:

(a) The CFPB;

(b) Any employee of the CFPB in his or her official capacity;

(c) Any employee of the CFPB in his or her individual capacity where DOJ has agreed to represent the employee; or

(d) The United States, where the CFPB determines that litigation is likely to affect the CFPB or any of its components.

(8) Appropriate Federal, State, local, foreign, Tribal, or self-regulatory organizations or agencies responsible for investigating, prosecuting, enforcing, implementing, issuing, or carrying out a statute, rule, regulation, order, policy, or license if the information may be relevant to a potential violation of civil or criminal law, rule, regulation, order, policy, or license;

(9) To the National Archives and Records Administration (NARA) or other Federal government agencies pursuant to records management inspections being conducted under the authority of 44 U.S.C. 2904 and 2906;

(10) Any authorized agency or component of the Department of Treasury, the Department of Justice (DOJ), the Federal Reserve System, the Federal Deposit Insurance Corporation or other law enforcement authorities including disclosure by such authorities: (a) To the extent relevant and necessary in connection with litigation in proceedings before a court or other adjudicative body, where (i) The United States is a party to or has an interest in the litigation, including where the agency, or an agency component, or an agency official or employee in his or her official capacity, or an individual agency official or employee whom the DOJ or the CFPB has agreed to represent, is or may likely become a party, and (ii) the litigation is likely to affect the agency or any component thereof; or (b) To outside experts or consultants when considered appropriate by CFPB staff to assist in the conduct of agency matters.

(11) A grand jury pursuant either to a Federal or State grand jury subpoena, or to a prosecution request that such record be released for the purpose of its introduction to a grand jury, where the subpoena or request has been specifically approved by a court. In those cases where the Federal Government is not a party to the proceeding, records may be disclosed if a subpoena has been signed by a judge.

(12) A court, magistrate, or administrative tribunal in the course of an administrative proceeding or judicial proceeding, including disclosures to opposing

counsel or witnesses (including expert witnesses) in the course of discovery or other pre- hearing exchanges of information, litigation, or settlement negotiations, where relevant or potentially relevant to a proceeding, or in connection with criminal law proceedings.

(13) Appropriate agencies, entities, and persons, including but not limited to potential expert witnesses or witnesses in the course of investigations, to the extent necessary to secure information relevant to the investigation; and

(14) An entity or person that is the subject of supervision or enforcement activities including examinations, investigations, administrative proceedings, and litigation, and the attorney or non-attorney representative for that entity or person. 89 Fed. Reg. at 73079-80.

21.     In its internal regulations, at 12 C.F.R. Part 1070, CFPB explicitly recognizes its statutory obligations under the Privacy Act regarding the disclosure, production, and withholding of information. When describing the restrictions on disclosure under the Act, CFPB states that it "will not disclose any record about an individual contained in a [CFPB] system of records to any person or agency without the prior written consent of that individual unless the disclosure is authorized by 5 U.S.C. 552a(b)." 12 C.F.R. § 1070.59. In that same rule, CFPB recognizes that the only disclosures authorized by the "routine use" exception are "disclosures that are compatible with one or more routine uses contained within the CFPB's Systems of Records Notices." *Id.*

### Additional Statutory and Regulatory Obligations Pertaining to Disclosure

22.     In addition to the Privacy Act, CFPB is subject to the Consumer
Financial Protection Act of 2010, 12 U.S.C. § 5481 *et seq.*; the Right to Financial
Privacy Act of 1978, 12 U.S.C. § 3401; the Trade Secrets Act, 18 U.S.C. § 1905; and
other laws.

23.     Consistent with those laws, CFPB has made clear that, except for
previously recognized exceptions, "employees or former employees of the CFPB, or
others in possession of a record of the CFPB that the CFPB has not already made
public, are *prohibited from disclosing such records, without authorization, to any
person who is not an employee of the CFPB.*" 12 C.F.R. § 1070.4 (emphasis added).

24.     Likewise, except as for previously recognized exceptions, "no current or
former employee [ ] of the CFPB, or any other person in possession of confidential
information, shall disclose such confidential information by any means (including
written or oral communications) or in any format (including paper and electronic
formats), to "[a]ny person who is not an employee, contractor, or consultant of the
CFPB". *Id.* § 1070.41.

### Creation of DOGE

25.     Donald J. Trump was inaugurated as President of the United States on
January 20, 2025. That same day, President Trump issued an executive order
establishing the "Department of Government Efficiency" (DOGE). Under that
executive order, the United States Digital Service was renamed the United States
DOGE Service (USDS).  A "temporary organization," to be led by a USDS

Administrator, was also established and called "the U.S. DOGE Service Temporary Organization." Exec. Order No. 14,158 (Jan. 20, 2025).

26.    The executive order directs each agency head, in consultation with the USDS Administrator, to establish a DOGE team. According to the executive order, agency team members may include current agency personnel or new hires designated as "special government employees." Each agency's team is directed to coordinate with USDS and advise its agency head on implementing the DOGE agenda. *See* Congressional Research Service, *Establishing and Implementing the President's Department of Government Efficiency: Executive Order 14158* (Feb. 6, 2025).

27.    The executive order directs agency heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." Exec. Order No. 14,158 (Jan. 20, 2025).

28.    The executive order, moreover, purports to "displace[] all prior executive orders and regulations . . . that might serve as a barrier to providing USDS access to agency records and systems". *Id.*

29.    As of February 9, 2025, President Trump has not formally named a USDS Administrator.

30.    In November 2024, then-President-elect Trump announced that billionaire entrepreneur Elon Musk would have a leadership role in DOGE.

According to President-elect Trump, DOGE would look at topics including

regulations, expenditures, and restructuring agencies. *See*

https://truthsocial.com/@realDonaldTrump/posts/113472884874740859 (last visited

Feb. 9, 2025).

31.    It is widely reported that, since the inauguration, Mr. Musk has played

a leadership role in DOGE activities across the federal government. The Trump

Administration has described Mr. Musk as a "special government employee." *See*

https://www.reuters.com/world/us/trump-makes-musk-worlds-richest-man-special-

government-employee-2025-02-03/ (last visited Feb. 9, 2025).

32.    DOGE team members have also been described as "special government

employees." As of February 9, 2025, DOGE teams have embedded into several

federal agencies including CFPB.

### DOGE Activities at CFPB

33.    The DOGE executive order focuses on the administration's efforts

toward "modernizing Federal technology and software to maximize governmental

efficiency and productivity". The executive order specifically highlights a "Software

Modernization Initiative" aimed at (a) improving the "quality and efficiency of

government-wide software, network infrastructure, and information technology (IT)

systems." It directs the USDS Administrator to work with agency heads "to promote

inter-operability between agency networks and systems, ensure data integrity, and

facilitate responsible data collection and synchronization." Exec. Order No. 14,158.

34.    Multiple reports state, however, that DOGE teams are seeking full access to agency records, information, and systems unrelated to DOGE's stated mission. *See*, *e.g.*, https://x.com/DOGE/status/1885420298138247458 (last visited Feb. 9, 2025) (information related to DEI contract payments); https://www.washingtonpost.com/politics/2025/02/02/usaid-trump-musk/ (last visited Feb. 9, 2025) (access to a sensitive compartmented information facility (SCIF), in which highly classified information is reviewed); https://bsky.app/profile/wyden.senate.gov/post/3lh5ejpwncc23 (last visited Feb. 9, 2025) (full access includes systems with information about Social Security and Medicare benefits, grants, and payments to government contractors).

35.    At the Office of Personnel Management (OPM), a DOGE team sought and obtained access to federal employee personnel information. DOGE team members have access to a massive database called Enterprise Human Resources Integration, which contains dates of birth, Social Security numbers, appraisals, home addresses, pay grades and length of service of government workers. *See* https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31/ (last visited Feb. 9, 2025). Senior career staff at OPM have reportedly had their credentials revoked and can no longer access certain systems.

36.    On January 31, 2025, President Trump designated Secretary of the Treasury Scott Bessent as Acting Director of the Consumer Financial Protection Bureau.

37.     On the evening of February 6, 2025, at least one of three DOGE "special government employees" entered CFPB. The next day, February 7, three individuals [Chris Young, Nikhil Rajpal and Gavin Kliger] had been added to the Bureau's staff and email directory as "senior advisers." Mr. Young, Mr. Rajpal and Mr. Kliger are not and have never been CFPB employees.

38.     On information and belief, Mr. Bessent instructed CFPB staff to give the Mr. Young, Mr. Rajpal and Mr. Kliger "read only" access to various internal systems

39.     On the evening of February 7, President Trump replaced Mr. Bessent as Acting Director of CFPB with newly confirmed head of the Office of Management and Budget Russell Vought. Mr. Vought is now the Acting Director of CFPB. https://www.wsj.com/finance/regulation/russell-vought-taking-over-as-new-acting-head-of-cfpb-9650d338?st=4x6bnM&reflink=article_email_share (last visited Feb. 9, 2025).

40.     The same day he assumed the role of Acting Director, on February 7, Mr. Vought instructed CFPB staff to grant the DOGE team access to all non-classified CFPB systems.

41.     Also, that same day, Mr. Musk posted "RIP CFPB" on his personal X account. See https://x.com/elonmusk/status/1887979940269666769 (last visited Feb. 9, 2025). That sentiment follows repeated statements by Mr. Musk critical of the Bureau and its work. *See*, *e.g.*,

https://x.com/elonmusk/status/1861644897490751865?source=email (last visited

Feb. 9, 2025).

### Harm of Unlawful Disclosure to CFPB Employees

42.     CFPB has a statutory responsibility to protect the information that it

collects and maintains about its employees from unlawful disclosure to third

parties. The Bureau has acted contrary to law and regulation by granting DOGE

and its members access to the records that the Bureau collects and maintains about

every CFPB employee.

43.     CFPB has not, and indeed cannot, show that disclosure of employee

information to DOGE falls within a statutory exception to the Privacy Act. Because

Mr. Musk, Mr. Young, Mr. Rajpal and Mr. Kliger are not "officers [or] employees" of

CFPB, but rather "special government employees" outside of Bureau supervision,

the "need to know" exception under 5 U.S.C. § 552a(b)(1) has not been met.

44.     Nor can CFPB show that disclosure of employee information is

permissible under the "routine use" exception to the Privacy Act. To meet the

statutory definition of "routine use", disclosure of the information must be

"compatible with the purpose for which [the information] was collected." 5 U.S.C. §

552a(a)(7). CFPB has failed to demonstrate how the disclosure of employee

information to DOGE members comports with the intended use of that employee

information.

45.     Moreover, even if disclosure of employee information to DOGE could be

defined as a "routine use", none of the permissible routine uses listed in CFPB's

September 2024 Notice of System of Records allow for the disclosure of employee information to DOGE or its members. *Cf.* 89 Fed. Reg. at 73079.

46.    With no Privacy Act exception justifying the disclosure of employee information to DOGE team members, CFPB was required to obtain the consent of affected employees, which it did not do.

47.    NTEU represents more than 1,000 current and former bargaining unit employees at CFPB, of which approximately 750 are dues-paying members of the union. These employees face irreparable harm to their privacy interests if their employee information is improperly accessed and/or disseminated by individuals associated with DOGE. Once an employee's personnel information is improperly disclosed, the harm to the employee cannot be undone.

48.    Catherine Farman is a current employee of the Consumer Financial Protection Bureau. Ms. Farman has worked for CFPB as an IT Specialist since January 12, 2015. As a current employee, Ms. Farman's personnel information and personally identifiable information (PII) is contained in several CFPB systems of record, to include but not limited to SharePoint, eOPF, HR Connect, Federal Reserve Benefits, WebTA, ServiceNow, Microsoft Office 365, Sailpoint, Everbridge, and Federal Employees Health Benefits. Ms. Farman has significant concerns about the release of that information to individuals associated with DOGE, including but not limited to Mr. Musk, Mr. Young, Mr. Rajpal and Mr. Kliger. She is concerned individuals associated with DOGE will leak her personnel information to the public, leading to harassment. Ms. Farman also fears that her personnel information and

PII is no longer secure, which puts it at risk of being hacked or compromised, because there are no known security constraints and zero oversight regarding the disclosure of her personal information to DOGE.

49.    Since 2018, Ms. Farman has been a member of the National Treasury Employees Union. She was elected President of NTEU Chapter 335 in January 2020. As Chapter President, Ms. Farman has spoken to many CFPB employees about their concerns surrounding the disclosure of their personnel information to DOGE. Ms. Farman states that members are worried about improper disclosure of CFPB records of systems used by members, for example, calendar invites, emails, transcripts of Teams meetings, and messages sent on Teams. Members are worried that individuals associated with DOGE will use that information to identify employees as Union members and target them for adverse action. Members who work on cases are concerned that individuals associated with DOGE will get access to their reports on enforcement or supervision activities and use that information to retaliate against them. According to Ms. Farman, members are also concerned that their personnel information will be used to stop, lower, or otherwise modify their salaries and other benefits; to blackmail, threaten, or intimidate them; to prevent them from obtaining future employment; to deny them goods and services such as loans and childcare; in identity theft and social engineering attempts against them; in advertising and marketing directed at them. Finally, members with reasonable accommodations are concerned that individuals associated with DOGE will get

access to their confidential medical information and use that to retaliate against them.

50.    Jasmine Hardy is a current employee of the Consumer Financial Protection Bureau. Ms. Hardy has worked for CFPB as an Examiner since August 14, 2011. As a current employee, Ms. Hardy's personnel information is contained in several CFPB systems of record, to include HR Connect, eOPF, the National Finance Center's Employee Personal Page, the Federal Reserve Thrift Plan, and the Federal Reserve Retirement Plan. Ms. Hardy has significant concerns about the release of that information to individuals associated with DOGE, including but not limited to Mr. Musk, Mr. Young, Mr. Rajpal and Mr. Kliger. She is concerned about the sensitive information needed to access her credit, her health records, and her employment records being available outside of the agency's secured systems.

51.    Ms. Hardy has been a member of the National Treasury Employees Union since 2012. She was elected Vice President of NTEU Chapter 335 in November 2021. As Chapter Vice President, Ms. Hardy has spoken to many CFPB union members about their concerns surrounding the disclosure of their employee and personnel information to individuals associated with DOGE. Employees have expressed concerns to Ms. Hardy about the improper disclosure of their credit, health records, and employment records, along with concerns about being harassed on social media.

52.    CFPB's actions have harmed NTEU members, including Ms. Farman and Ms. Hardy, by depriving them of the privacy protections guaranteed to them by federal law and regulation.

## <u>CAUSE OF ACTION:</u> COUNT I (Contrary to law)

53.    Plaintiff NTEU reasserts the allegations contained in paragraphs 1 through 52 of this complaint as though contained herein.

54.    Defendant CFPB has, since February 7, 2025, provided individuals associated with DOGE access to agency systems of records containing employee information.

55.    The Privacy Act prohibits Defendant CFPB from disclosing employee records to individuals associated with DOGE, in the absence of the individual's consent to disclosure or an identified routine use or other exception to the Act.

56.    Defendant CFPB has granted access, and by extension, disclosed employee records to individuals associated with DOGE without employee consent to such disclosure.

57.    Defendant CFPB has granted access, and by extension, disclosed employee records to individuals who are not officers or employees of the Bureau.

58.    Defendant CFPB has granted access, and by extension, disclosed employee records to individuals associated with DOGE for purposes other than the routine uses specified on the Bureau's Notice of System of Records.

59.     Because individuals associated with DOGE are not CFPB employees, regulations promulgated by CFPB further prohibit Defendant CFPB from disclosing employee records to DOGE without authorization.

60.     The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

61.     Defendant CFPB's violate the prohibitions in the Privacy Act and CFPB regulations at 5 C.F.R. Part 1070 and therefore are contrary to law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NTEU requests judgment against Defendant CFPB :

A. Declaring that Defendant CFPB's decision to authorize members of the Department of Government Efficiency to access CFPB systems, including employee information, is unlawful.

B. Declaring that the disclosure of employee records and information to members of the Department of Government Efficiency is unlawful.

C. Enjoin Defendant CFPB from granting access and, by extension, disclosing employee records and information to members of the Department of Government Efficiency, except as required by law.

D. Ordering Defendant CFPB to pay reasonable attorneys' fees and costs; and

E. Ordering such other and further relief as the Court deems just and proper.

Respectfully submitted,

 /s/  Julie M. Wilson
JULIE M. WILSON
General Counsel
D.C. Bar 482946

 /s/  Paras N. Shah
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881

 /s/  Allison C. Giles
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705


NATIONAL TREASURY EMPLOYEES UNION
800 K Street, N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org

February 9, 2025          Attorneys for Plaintiff NTEU