IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL TREASURY EMPLOYEES UNION | ) | |
| 800 K Street, N.W., Suite 1000 | ) | |
| Washington, D.C.  20001 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. **1:25-cv-00380** |
| | ) | |
| RUSSELL VOUGHT, in his official capacity as | ) | FIRST AMENDED |
| Acting Director of the | ) | COMPLAINT FOR |
| Consumer Financial Protection Bureau, | ) | DECLARATORY |
| 1700 G Street, N.W. | ) | AND INJUNCTIVE |
| Washington, D.C.  20552 | ) | RELIEF |
| | ) | |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

Plaintiff National Treasury Employees Union (NTEU) is a labor union that represents federal government employees working in 37 agencies and departments. NTEU negotiates collective bargaining agreements with agency employers, pushes for legislation that improves the working lives of federal employees, and engages in general advocacy for federal employees' rights. NTEU's mission is to ensure that federal employees are treated with dignity and respect.

NTEU brings this action on behalf of its members, current and former employees of the Consumer Financial Protection Bureau, seeking to stop the Bureau's disclosure of employees' personal information to the members of the

"Department of Government Efficiency." The Bureau's action divests NTEU members of their privacy rights, in violation of federal law and regulation.

## JURISDICTION

1.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## VENUE

2.    Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e). NTEU is located in Washington, D.C. Defendant also resides in Washington D.C., and a substantial part of the events or omissions giving rise to the claim occurred in Washington, D.C. because the Consumer Financial Protection Bureau is headquartered here.

## PARTIES

3.    Plaintiff NTEU is an unincorporated association with its principal place of business at 800 K Street, N.W., Suite 1000, Washington, D.C. 20001. NTEU is, pursuant to Title VII of the Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111, the exclusive bargaining representative of tens of thousands of federal employees in 37 departments and agencies, to include more than a thousand current and former employees of the Consumer Financial Protection Bureau. NTEU represents the interests of these employees by enforcing employees' collective and individual rights through grievances and federal court litigation; negotiating collective bargaining

2

agreements; filing unfair labor practice charges; and advocating in Congress for favorable working conditions, pay, and benefits.

4.      NTEU brings this action on behalf of its members who are current or former employees of the Consumer Financial Protection Bureau.

5.      Defendant Russell Vought is head of the Office of Management and Budget (OMB) and, as of February 7, 2025, the Acting Director of the Consumer Financial Protection Bureau.

<u>STATEMENT OF CLAIMS</u>

6.      Created in the aftermath of the 2007–08 financial crisis, Defendant Consumer Financial Protection Bureau (CFPB) is an independent agency of the U.S. Government whose mission is to support and protect American consumers in the financial marketplace. It accomplishes that mission by monitoring financial markets for risks to consumers; enforcing consumer finance law; investigating consumer complaints; and writing rules to protect consumers from unfair, deceptive, or abusive practices in the financial sector. Pub. L. No. 111-203, 124 Stat. 1376 (2010). *See* https://www.consumerfinance.gov/about-us/the-bureau/ (last visited May 28, 2025).

7.      CFPB has supervisory authority over depository institutions with $10 billion or more in assets such as banks, thrifts, and credits unions. The Bureau has supervisory authority over non-depository entities such as mortgage originators and servicers, payday lenders, and private student

lenders. In addition, the Bureau supervises consumer reporting, consumer debt collection and foreclosure, student loan servicing, international money transfer, and automobile financing. *See* https://www.consumerfinance.gov/compliance/supervision-examinations/institutions/ (last visited May 28, 2025).

8.     As of December 2024, CFPB had obtained more than $21 billion in monetary compensation, principal reductions, cancelled debts, and other consumer relief as part of its enforcement and supervisory work. Through its enforcement activities, CFPB had collected approximately $363 million associated with harm to American servicemembers and veterans. And more than $5 billion had been collected by CFPB from companies and individuals that violated the law, which the Bureau deposits into a victim relief fund. *See* https://www.consumerfinance.gov/about-us/the-bureau/ (last visited May 28, 2025).

9.     As of December 2024, CFPB had received approximately 6.8 million complaints from consumers, including more than 4.6 million complaints about credit reporting; 83,000 complaints about medical debt collection; and 96,000 complaints about student loans. *See id.*

### CFPB's Privacy Act Obligations Pertaining to Disclosure

10.     While carrying out its statutory responsibilities on behalf of consumers, CFPB is subject to the requirements of the Privacy Act, 5 U.S.C. § 551 *et. seq.*, with respect to any system of records that it maintains on

individuals. This statutory obligation also applies to records and information that CFPB maintains about its current and former employees.

11.     The Privacy Act requires that an agency like CFPB publish a notice in the Federal Register whenever it establishes or revises a system of records. 5 U.S.C. § 552a(e)(4).

12.     At least 30 days before issuing a System of Records Notice, the agency must "publish in the Federal Register notice of any new use or intended use of the information in the system [] and provide an opportunity for interested persons to submit written data, views, or arguments to the agency." *Id.* § 552a(e)(11).

13.     The agency is prohibited from disclosing records covered by the Privacy Act to any other person or agency unless "the individual to whom the record pertains" consents or a statutory exception to disclosure applies. *Id.* § 552a(b).

14.     The Privacy Act permits the disclosure of information in twelve specified exceptions. For example, an agency is authorized under the Privacy Act to disclose records and information about individuals to the Census Bureau, to law enforcement, to Congress, or pursuant to a court order. *See, e.g., id.*

15.     An additional exception, at *id.* § 552a(b)(1), allows for disclosure of records "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties".

16.     Another exception permits an agency to disclose information for "routine use". *Id.* § 552a(b)(3). "[T]he term 'routine use' means, with respect to the disclosure of a record, the use of such record for a purpose for which it was collected". *Id.* § 552a(a)(7).

17.     Prior to disclosure for "routine use", the Privacy Act requires the agency to identify "each routine use of the records contained in the system, including the categories of users and the purpose of such use". *Id.* § 552a(e)(4).

18.     The System of Records Notice for CFPB regarding its "Employee Administrative Records System" was published in the Federal Register on August 11, 2020. 85 Fed. Reg. 48,510 (Aug. 11, 2020). That Notice identifies categories of individuals whose records and information are housed in CFPB's system of employee-related records, including "[c]urrent and former Bureau employees, volunteers, detailees, applicants, and persons who work at the Bureau (collectively employees), and their named dependents and/or beneficiaries, their named emergency contacts, and individuals who have been extended offers of employment." 85 Fed. Reg. at 48,510–11.

19.     CFPB regularly collects and uses information about these employees. The Employee Administrative Records System of Records Notice lists the categories of employee-related records collected and used by the Bureau, for example, and "without limitation:"

(1) Identification and contact information, including name, address, email address, phone number and other contact information; (2)

employee emergency contact information, including name, phone number, relationship to employee or emergency contact; (3) Social Security number (SSN), employee ID number, organization code, pay rate, salary, grade, length of service, and other related pay and leave records including payroll data; (4) biographic and demographic data, including date of birth and marital or domestic partnership status; (5) employment-related information such as performance reports, training, professional licenses, certification, and memberships information, alternative dispute resolution processes, fitness center membership information, union dues, employee claims for loss or damage to personal property, and other information related to employment by the Bureau; (6) benefits data, such as health, life, travel, and disability insurance information; (7) retirement benefits information and flexible spending account information; and (8) time and attendance records. *Id.*

20.    In that same Employee Administrative Records System of Records Notice, CFPB updated its list of routine uses, including categories of users and the purposes of such uses. Consistent with that Notice, the records contained in CFPB's system of records "may be disclosed, consistent with the Bureau's Disclosure of Records and Information Rules, promulgated at 12 C.F.R. § 1070 *et seq.,*" for "routine uses" *only* to  the following entities and under the following circumstances:

(1) Appropriate agencies, entities, and persons when (a) the Bureau suspects or has confirmed that there has been a breach of the system of records; (b) the Bureau has determined that as a result of the suspected or confirmed breach there is a risk of harm to individuals, the Bureau (including its information systems, programs, and operations), the Federal Government, or national security; and (c) the disclosure made to such agencies, entities, and persons is reasonably necessary to assist in connection with the Bureau's efforts to respond to the suspected or confirmed breach or to prevent, minimize, or remedy such harm;

(2) Another Federal agency or Federal entity, when the Bureau determines that information from this system of records is

reasonably necessary to assist the recipient agency or entity in (a) responding to a suspected or confirmed breach or (b) preventing, minimizing, or remedying the risk of harm to individuals, the recipient agency or entity (including its information systems, programs, and operations), the Federal Government, or national security, resulting from a suspected or confirmed breach;

(3) Another Federal or State agency to (a) permit a decision as to access, amendment or correction of records to be made in consultation with or by that agency, or (b) verify the identity of an individual or the accuracy of information submitted by an individual who has requested access to or amendment or correction of records;

(4) The Office of the President in response to an inquiry from that office made at the request of the subject of a record or a third party on that person's behalf;

(5) Congressional offices in response to an inquiry made at the request of the individual to whom the record pertains;

(6) Contractors, agents, or other authorized individuals performing work on a contract, service, cooperative agreement, job, or other activity on behalf of the Bureau or Federal Government and who have a need to access the information in the performance of their duties or activities;

(7) The Department of Justice (DOJ) for its use in providing legal advice to the Bureau or in representing the Bureau in a proceeding before a court, adjudicative body, or other administrative body, where the use of such information by the DOJ is deemed by the Bureau to be relevant and necessary to the advice or proceeding, and such proceeding names as a party in interest: (a) The Bureau; (b) Any employee of the Bureau in his or her official capacity; (c) Any employee of the Bureau in his or her individual capacity where DOJ has agreed to represent the employee; or (d) The United States, where the Bureau determines that litigation is likely to affect the Bureau or any of its components;

(8) A grand jury pursuant either to a Federal or State grand jury subpoena, or to a prosecution request that such record be released for the purpose of its introduction to a grand jury, where the subpoena or request has been specifically approved by a court. In those cases where the Federal Government is not a

party to the proceeding, records may be disclosed if a subpoena has been signed by a judge;

(9) A court, magistrate, or administrative tribunal in the course of an administrative proceeding or judicial proceeding, including disclosures to opposing counsel or witnesses (including expert witnesses) in the course of discovery or other pre-hearing exchanges of information, litigation, or settlement negotiations, where relevant or potentially relevant to a proceeding, or in connection with criminal law proceedings;

(10) Appropriate agencies, entities, and persons to the extent necessary to obtain information relevant to current and former Bureau employees' benefits, compensation, and employment;

(11) Appropriate Federal, State, local, foreign, tribal, or self-regulatory organizations or agencies responsible for investigating, prosecuting, enforcing, implementing, issuing, or carrying out a statute, rule, regulation, order, policy, or license if the information may be relevant to a potential violation of civil or criminal law, rule, regulation, order, policy, or license;

(12) National, State or local income security and retirement agencies or entities involved in administration of employee retirement and benefits programs (*e.g.,* State unemployment compensation agencies and State pension plans) and any of such agencies' contractors or plan administrators, when necessary to determine employee eligibility to participate in retirement or employee benefits programs, process employee participation in those programs, process claims with respect to individual employee participation in those programs, audit benefits paid under those programs, or perform any other administrative function in connection with those programs;

(13) An executor of the estate of a current or former employee, a government entity probating the will of a current or former employee, a designated beneficiary of a current or former employee, or any person who is responsible for the care of a current or former employee, where the employee has died, has been declared mentally incompetent, or is under other legal disability, to the extent necessary to assist in obtaining any employment benefit or working condition for the current or former employee;

(14) The Internal Revenue Service (IRS) and other governmental entities that are authorized to tax employees' compensation with wage and tax information in accordance with a withholding

agreement with the Bureau pursuant to 5 U.S.C. §§ 5516, 5517, and 5520, for the purpose of furnishing employees with IRS Forms W-2 that report such tax distributions;

(15) Unions recognized as exclusive bargaining representatives under the Civil Service Reform Act of 1978, 5 U.S.C. §§ 7111, 7114; and

(16) Carriers, providers and other Federal agencies involved in administration of employee retirement and benefits programs and such agencies' contractors or plan administrators, when necessary to determine employee eligibility to participate in retirement and benefits programs, process employee participation in those programs, process claims with respect to individual employee participation in those programs, audit benefits paid under those programs, or perform any other administrative function in connection with those programs and Federal agencies that perform payroll and personnel processing and employee retirement and benefits plan services under interagency agreements or contracts, including the issuance of paychecks to employees, the distribution of wages, the administration of deductions from paychecks for retirement and benefits programs, and the distribution and receipt of those deductions. These agencies include, without limitation, the Department of Labor, the Department of Veterans Affairs, the Social Security Administration, the Federal Retirement Thrift Investment Board, the Department of Defense, OPM, the Board of Governors of the Federal Reserve System, the Department of the Treasury, and the National Finance Center at the U.S. Department of Agriculture. 85 Fed. Reg. at 48,511–12.

21.    These narrow "routine uses" outlined in the Employee Administrative Records System of Records Notice do not include disclosure for purposes of dismantling CFPB.

22.    In its internal regulations, at 12 C.F.R. Part 1070, CFPB explicitly recognizes its statutory obligations under the Privacy Act regarding the disclosure, production, and withholding of information. When describing the restrictions on disclosure under the Act, CFPB states that it "will not

disclose any record about an individual contained in a [CFPB] system of records to any person or agency without the prior written consent of that individual unless the disclosure is authorized by 5 U.S.C. § 552a(b)." 12 C.F.R. § 1070.59. In that same rule, CFPB recognizes that the only disclosures authorized by the "routine use" exception are "disclosures that are compatible with one or more routine uses contained within the CFPB's Systems of Records Notices." *Id.*

### Additional Statutory and Regulatory Obligations Pertaining to Disclosure

23.     In addition to the Privacy Act, CFPB is subject to, *inter alia*, the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5481 *et seq.* and the Right to Financial Privacy Act of 1978, 12 U.S.C. § 3401.

24.     Consistent with those laws, CFPB has made clear that, except for previously recognized exceptions, "employees or former employees of the CFPB, or others in possession of a record of the CFPB that the CFPB has not already made public, are *prohibited from disclosing such records, without authorization, to any person who is not an employee of the CFPB*." 12 C.F.R. § 1070.4 (emphasis added).

25.     Likewise, except as for previously recognized exceptions, "no current or former employee [ ] of the CFPB, or any other person in possession of confidential information, shall disclose such confidential information by any means (including written or oral communications) or in any format

11

(including paper and electronic formats), to "[a]ny person who is not an employee, contractor, or consultant of the CFPB". *Id.* § 1070.41.

## **Creation of DOGE**

26.    Donald J. Trump was inaugurated as President of the United States on January 20, 2025. That same day, President Trump issued an executive order establishing the "Department of Government Efficiency" (DOGE). Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025) (EO 14158). Under that executive order, the United States Digital Service was renamed the United States DOGE Service (USDS). A "temporary organization," to be led by a USDS Administrator, was also established and called "the U.S. DOGE Service Temporary Organization." *Id.*

27.    The executive order directs each agency head, in consultation with the USDS Administrator, to establish a DOGE team comprised of at least four employees within their respective agencies. According to the executive order, agency team members may include current agency personnel or new hires designated as "Special Government Employees." DOGE teams are required to "coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.*

28.    The executive order directs agency heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." EO 14158.

29.   The executive order, moreover, purports to "displace[] all prior executive orders and regulations . . . that might serve as a barrier to providing USDS access to agency records and systems". *Id.*

30.   In November 2024, then-President-elect Trump announced that billionaire entrepreneur Elon Musk would have a leadership role in DOGE. According to President-elect Trump, DOGE would look at topics including regulations, expenditures, and restructuring agencies. *See* https://truthsocial.com/@realDonaldTrump/posts/113472884874740859 (last visited May 28, 2025).

31.   It is widely reported that, following the inauguration, Mr. Musk played a leadership role in DOGE activities across the federal government. The Trump Administration has described Mr. Musk as a "special government employee." *See* https://www.reuters.com/world/us/trump-makes-musk-worlds-richest-man-special-government-employee-2025-02-03/ (last visited May 28, 2025).

32.   In February of 2025, Amy Gleason was named Acting Administrator of DOGE. *See* White House reveals who DOGE acting administrator is, CNN Politics, https://www.cnn.com/2025/02/25/politics/amy-gleason-doge-acting-administrator (last visited Aug. 7, 2025).

33.   Despite Gleason being named as Acting Administrator of DOGE, White House press secretary Karoline Leavitt continued to confirm Mr. Musk's DOGE involvement and leadership role: "So, the president tasked

Elon Musk to oversee the DOGE effort . . . There are career officials and

there are political appointees who are helping run DOGE on a day-to-day

basis." *Id.*

34. DOGE team members have also been described as "special

government employees." As currently constituted, DOGE is a network of

individuals located at various offices, including the Office of Personnel

Management, and embedded at agencies throughout the federal government.

**DOGE Activities at CFPB**

35. The DOGE executive order focuses on the administration's

efforts toward "modernizing Federal technology and software to maximize

governmental efficiency and productivity". The executive order specifically

highlights a "Software Modernization Initiative" aimed at (a) improving the

"quality and efficiency of government-wide software, network infrastructure,

and information technology (IT) systems." It directs the USDS Administrator

to work with agency heads "to promote inter-operability between agency

networks and systems, ensure data integrity, and facilitate responsible data

collection and synchronization." EO 14158, Sec. 4.

36. Multiple reports state, however, that DOGE teams are seeking

full access to agency records, information, and systems unrelated to DOGE's

stated mission. *See*, *e.g.*, https://x.com/DOGE/status/1885420298138247458

(last visited May 28, 2025) (information related to DEI contract payments);

https://www.washingtonpost.com/politics/2025/02/02/usaid-trump-musk/ (last

visited May 28, 2025) (access to a sensitive compartmented information facility (SCIF), in which highly classified information is reviewed); https://bsky.app/profile/wyden.senate.gov/post/3lh5ejpwncc23 (last visited May 28, 2025) (full access includes systems with information about Social Security and Medicare benefits, grants, and payments to government contractors).

37.    At the Office of Personnel Management (OPM), a DOGE team sought and obtained access to federal employee personnel information. DOGE team members have access to a massive database called Enterprise Human Resources Integration, which contains dates of birth, Social Security numbers, appraisals, home addresses, pay grades and length of service of government workers. *See* https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31/ (last visited May 28, 2025). Senior career staff at OPM have reportedly had their credentials revoked and can no longer access certain systems.

38.    On January 31, 2025, President Trump designated Secretary of the Treasury Scott Bessent as Acting Director of the CFPB.

39.    On the evening of February 6, 2025, officials from the Department of Treasury notified CFPB officials that two DOGE officials would need access to CFPB's headquarters. Members of DOGE, including Christopher Young, then entered CFPB Headquarters.

40.     On the evening of Friday, February 7, President Trump replaced Mr. Bessent as Acting Director of CFPB with newly confirmed head of the OMB, Russell Vought. Mr. Vought is now the Acting Director of CFPB. https://www.wsj.com/finance/regulation/russell-vought-taking-over-as-new-acting-head-of-cfpb-9650d338 (last visited May 28, 2025).

41.     The same day he assumed the role of Acting Director, February 7, Mr. Vought instructed CFPB staff to grant the DOGE team access to all non-classified CFPB systems. CFPB management and DOGE team personnel Christopher Young, Jordan Wick, and Jeremy Lewin had a follow-up meeting. Additional DOGE employees arrived, and DOGE personnel gained access to all non-classified CFPB systems.

42.     That same day, Mr. Musk posted "CFPB RIP" on his personal X account. See https://x.com/elonmusk/status/1887979940269666769 (last visited Aug. 7, 2025). That sentiment follows repeated statements by Mr. Musk critical of the Bureau and its work. *See*, *e.g.*, https://x.com/elonmusk/status/1861644897490751865 (last visited Aug. 6, 2025).

43.     The next workday (Monday, February 10, 2025), Acting Director Vought sent an email to all CFPB employees directing them to stop coming to the office or performing "any work tasks." In a follow-up email exchange, CFPB's Chief Operating Officer confirmed to CFPB's Chief Information

Officer that his team should be "[s]upporting US DOGE members with requests."

44.     Also, on February 10, President Trump told a reporter that he intends to have the CFPB "totally eliminated" because "number one, it was a bad group of people running it, but it was also a waste." *See* Alejandra Jaramillo, *Trump confirms goal to "totally eliminate" the Consumer Financial Protection Bureau*, CNN (Feb. 10, 2025), https://www.cnn.com/politics/live-news/trump-doge-presidency-news-02-10-25 (last visited Aug. 7, 2025).

45.     DOGE team personnel were granted access to CFPB records to further the goal of eliminating CFPB, not to modernize CFPB technology and software.

46.     DOGE team personnel who were granted access to CFPB records were not subject to training, security, or ethics requirements in place for CFPB employees and others typically allowed access to highly sensitive employee information and personally identifiable information (PII). *See, e.g*, *A DOGE aide involved in CFPB cuts owns stock prohibited by ethics laws*, Government Executive, https://www.govexec.com/oversight/2025/04/doge-aide-involved-cfpb-cuts-owns-stock-prohibited-ethics-laws/404931/ (last visited Aug. 7, 2025); Jake Pearson, *Musk Adviser May Make as Much as $1 Million a Year While Helping to Dismantle Agency that Regulates Tesla and X*, ProPublica, https://www.propublica.org/article/doge-elon-musk-chris-young-cfpb-tesla-x (last visited Aug. 7, 2025); *see also Nat'l Treasury Emps. Union v.*

*Vought*, No. 25-cv-381 (D.D.C.), Dkt. 38-5. **(**Declaration of CFPB employee "Drew Doe" stating that DOGE team personnel "were given full privileged access to CFPB systems and data, without following the process that the CFPB ordinarily requires to do so," such as completing training and executing documents outlining rules governing the use of CFPB systems and data).

<u>Harm of Unlawful Disclosure to CFPB Employees</u>

47.     CFPB has a statutory responsibility to protect the information that it collects and maintains about its employees from unlawful disclosure to third parties. The Bureau has acted contrary to law and regulation by granting DOGE and its members access to the records that the Bureau collects and maintains about every CFPB employee.

48.     CFPB has not, and indeed cannot, show that disclosure of employee information to DOGE falls within a statutory exception to the Privacy Act.

49.     Nor can CFPB show that disclosure of employee information is permissible under the "routine use" exception to the Privacy Act. To meet the statutory definition of "routine use", disclosure of the information must be "compatible with the purpose for which [the information] was collected." 5 U.S.C. § 552a(a)(7). CFPB has failed to demonstrate how the disclosure of specific and highly sensitive employee information, including Social Security numbers, personal addresses, biographic and demographic data, health-

related information, employment background information, and information related to employee family members, dependents, beneficiaries, and other emergency contacts, to DOGE members comports with the intended use of that employee information.

50.    Moreover, even if disclosure of employee information to DOGE could be defined as a "routine use", none of the permissible routine uses listed in CFPB's Employee Administrative Records System of Records Notice allow for the disclosure of such employee information to DOGE or its members. *See* 85 Fed. Reg. at 48,511–12.

51.    With no Privacy Act exception justifying the disclosure of employee information to DOGE team members, CFPB was required to obtain the consent of affected employees, which it did not do.

52.    NTEU represents more than 1,000 current and former bargaining unit employees at CFPB, of which approximately 750 are dues-paying members of the union. These employees face irreparable harm to their privacy interests if their employee information is improperly accessed and/or disseminated by individuals associated with DOGE. Once an employee's personnel information is improperly disclosed, the harm to the employee cannot be undone.

53.    Catherine Farman is a current employee of the Consumer Financial Protection Bureau. Ms. Farman has worked for CFPB as an IT Specialist since January 12, 2015. As a current employee, Ms. Farman's

personnel information and PII is contained in several CFPB systems of record, to include but not limited to SharePoint, eOPF, HR Connect, Federal Reserve Benefits, WebTA, ServiceNow, Microsoft Office 365, Sailpoint, Everbridge, and Federal Employees Health Benefits. Ms. Farman has significant concerns about the unauthorized disclosure of that information to individuals associated with DOGE, including but not limited to Mr. Musk, Mr. Young, and other DOGE team members. She is also concerned individuals associated with DOGE will leak her personnel information to the public, leading to harassment. *See, e.g., Federal employees targeted by Elon Musk face barrage of targeted harassment*, Rolling Stone (Nov. 27, 2024) http://rollingstone.com/politics/politics-news/elon-musk-targets-federal-employees-harassment-doge-1235183987/ (last accessed Aug. 7, 2025). Ms. Farman fears that her personnel information and PII are no longer secure, which puts it at risk of being hacked or compromised, because there are no known security constraints and zero oversight regarding the disclosure of her personal information to DOGE.

54. Since 2018, Ms. Farman has been a member of the National Treasury Employees Union. She was elected President of NTEU Chapter 335 in January 2020. As Chapter President, Ms. Farman has spoken to many CFPB employees about their concerns surrounding the unauthorized disclosure of their personnel information to DOGE. Ms. Farman states that members are worried about improper disclosure of CFPB records of systems

used by members, for example, calendar invites, emails, transcripts of Teams
meetings, and messages sent on Teams. Members are worried that
individuals associated with DOGE will use that information to identify
employees as Union members and target them for adverse action. Members
who work on cases are concerned that individuals associated with DOGE will
get access to their reports on enforcement or supervision activities and use
that information to retaliate against them. According to Ms. Farman,
members are also concerned that their personnel information will be used to
stop, lower, or otherwise modify their salaries and other benefits; to
blackmail, threaten, or intimidate them; to prevent them from obtaining
future employment; to deny them goods and services such as loans and
childcare; in identity theft and social engineering attempts against them; in
advertising and marketing directed at them. Finally, members with
reasonable accommodations are concerned that individuals associated with
DOGE with access to their confidential medical information will use that to
retaliate against them.

55.    Jasmine Hardy is a current employee of the Consumer Financial
Protection Bureau. Ms. Hardy has worked for CFPB as an Examiner since
August 14, 2011. As a current employee, Ms. Hardy's personnel information
is contained in several CFPB systems of record, to include HR Connect,
eOPF, the National Finance Center's Employee Personal Page, the Federal
Reserve Thrift Plan, and the Federal Reserve Retirement Plan. Ms. Hardy

has significant concerns about the release of that information to individuals associated with DOGE, including but not limited to Mr. Musk, Mr. Young, and other DOGE team members. She is concerned about the sensitive information needed to access her credit, her health records, and her employment records being available outside of the agency's secured systems.

56.    Ms. Hardy has been a member of the National Treasury Employees Union since 2012. She was elected Vice President of NTEU Chapter 335 in November 2021. As Chapter Vice President, Ms. Hardy has spoken to many CFPB union members about their concerns surrounding the disclosure of their employee and personnel information to individuals associated with DOGE. Employees have expressed concerns to Ms. Hardy about the improper disclosure of their credit, health records, and employment records, along with concerns about being harassed on social media.

57.    CFPB's actions have harmed NTEU members, including Ms. Farman and Ms. Hardy, by depriving them of the privacy protections guaranteed to them by federal law and regulation. Individuals associated with DOGE did not undergo the ethics, training, and security requirements of CFPB employees or other federal government workers.

58.    NTEU members are vulnerable due to the unauthorized and unfettered disclosure of their highly sensitive PII to the DOGE team, particularly given President Trump's public comments calling for CFPB to be

"totally eliminated" because those who work there are supposedly "a bad group of people running it." *See* Jaramillo, *Trump confirms goal* (supra).

### **CAUSE OF ACTION: COUNT I (Contrary to law)**

59.     Plaintiff NTEU reasserts the allegations contained in paragraphs 1 through 58 of this complaint as though contained herein.

60.     Defendant CFPB has, since February 7, 2025, provided individuals associated with DOGE access to agency systems of records containing highly sensitive employee information and PII, in effect adopting a system access policy for DOGE granting DOGE team members unfettered, unauthorized access.

61.     The Privacy Act prohibits Defendant CFPB from disclosing employee records to individuals associated with DOGE, in the absence of the individual's consent to disclosure or an identified routine use or other exception to the Act.

62.     Defendant CFPB has granted access, and by extension, disclosed highly sensitive employee records and PII to individuals associated with DOGE, without employee consent to such disclosure.

63.     Defendant CFPB has granted access, and by extension, disclosed highly sensitive employee records and PII to individuals who are not officers or employees of CFPB.

64.     Defendant CFPB has granted access, and by extension, disclosed highly sensitive employee records and PII to individuals associated with

DOGE in a manner that exceeds a "need to know" basis, particularly given the President's publicly stated goal to have CFPB "totally eliminated."

65.    Defendant CFPB has granted access, and by extension, disclosed highly sensitive employee records and PII to individuals associated with DOGE for purposes other than the routine uses specified on the Bureau's Notice of System of Records.

66.    The Administrative Procedure Act directs courts to hold unlawful and set aside agency actions that are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

67.    Under CFPB's newly adopted system access policy for DOGE team members, DOGE team personnel who were granted access to CFPB records were not subject to training, security, or ethics requirements in place for CFPB employees and others typically allowed access to highly sensitive employee information and PII. CFPB's newly adopted system access policy for DOGE team members violates the prohibitions in the Privacy Act and CFPB regulations at 5 C.F.R. Part 1070 and therefore is contrary to law.

68.    Defendant CFPB's system access policy for DOGE team members constitutes a final agency action that injures Plaintiff NTEU's members, and Plaintiff NTEU has no other adequate remedy in court. Accordingly, relief is available under the Administrative Procedure Act. 5 U.S.C. §§ 702, 704.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NTEU requests judgment against Defendant CFPB:

   A. Declaring that Defendant CFPB's decision to authorize members of the Department of Government Efficiency to access CFPB systems, including personal employee information, is unlawful.

   B. Declaring that the disclosure of employee records and information to members of the Department of Government Efficiency is unlawful.

   C. Enjoining Defendant CFPB from granting access and, by extension, disclosing personal employee records and information to members of the Department of Government Efficiency, except as required by law, and ordering Defendant CFPB to revoke and prohibit any further unlawful access to, collection of, disclosure of, or retention of such records to the Department of Government Efficiency and any of its team members, affiliates, or personnel;

   D. Ordering Defendant CFPB to facilitate the disgorgement or deletion of all unlawfully obtained, disclosed, or accessed CFPB employee PII from any Department of Government Efficiency team member's, affiliate's, or personnel's systems or devices on which it was not present on February 7, 2025.

   E. Ordering Defendant CFPB to pay reasonable attorneys' fees and costs; and

   F. Ordering such other and further relief as the Court deems just and proper.

Respectfully submitted,

 /s/  Julie M. Wilson
JULIE M. WILSON
General Counsel
D.C. Bar 482946

 /s/  Paras N. Shah
PARAS N. SHAH
Deputy General Counsel
D.C. Bar 983881

 /s/  Allison C. Giles
ALLISON C. GILES
Assistant Counsel
D.C. Bar 439705

 /s/  Lindsay Dunn
LINDSAY DUNN
Assistant Counsel
D.C. Bar 90036066
*pro hac vice*

NATIONAL TREASURY EMPLOYEES
UNION
800 K Street, N.W., Suite 1000
Washington, D.C.  20001
(202) 572-5500
julie.wilson@nteu.org
paras.shah@nteu.org
allie.giles@nteu.org
lindsay.dunn@nteu.org

August 11, 2025          Attorneys for Plaintiff NTEU